Cameron NORWOOD, Defendant–
Below, Appellant,

v.

STATE of Delaware, Plaintiff–
Below, Appellee.

No. 382, 2013.

Supreme Court of Delaware.

Submitted: May 14, 2014.
Decided: June 24, 2014.

Adam D. Windett, Esquire, Hopkins & Windett, LLC, Dover, Delaware, Attorney for Appellant.

Kathryn Garrison, Esquire, John Williams, Esquire, Department of Justice, Dover, Delaware, Attorneys for Appellee.

Before STRINE, Chief Justice, HOLLAND, BERGER, RIDGELY, Justices and NEWELL, Judge.[*]

STRINE, Chief Justice:

## I. INTRODUCTION

This appeal arises from the robbery of a Family Dollar store in Dover on September 4, 2012 by three men. The identities of two of the perpetrators were not the subject of dispute between the State and the defendant, Cameron Norwood, who the State charged with being the third man. But Norwood claims that he is innocent because he was not the third man. Norwood sought to create a reasonable doubt about his guilt by arguing that another man, Khalil Dixon, had been the third man who robbed the Family Dollar store on September 4, 2012. In support of that defense, Norwood tried to introduce evidence that Dixon and the same two perpetrators had also robbed the same Family Dollar on August 18, 2012 and attempted to rob it again on August 27, 2012. The State objected, and the Superior Court excluded the evidence at the State's request.

The Superior Court's decision to exclude the evidence was an abuse of discretion, given the substantial similarities between the prior crimes and this one. Because Norwood offered the evidence for the proper purpose of establishing the identity of the third man, who Norwood claimed was the actual perpetrator, the evidence was admissible under Delaware Rule of Evidence 404(b) and relevant under Rule 402. Furthermore, any potential prejudice caused by the evidence did not substantially outweigh its probative value under Rule 403. Indeed, it is easier to pass the Rule 403 balancing test when Rule 404(b) evidence does not involve the prior acts of the defendant on trial, and therefore the evidence does not create a risk that a jury will convict the defendant because the jury is convinced, not that the defendant is guilty of the charges he faces, but merely that the defendant is a bad person who deserves punishment. That was the case here, and the evidence Norwood sought to introduce posed no risk of prejudice, delay, or confusion of the issue that substantially outweighed the evidence's obvious relevance. The State has not argued that the error was harmless. Thus, the decision of the Superior Court must be reversed and the case be remanded for a new trial.

## II. BACKGROUND [1]

The defendant, Cameron Norwood, was charged with participating in a robbery of the Family Dollar store in Bay Court Plaza in Dover on September 4, 2012 with two other men. At trial, defense counsel argued that Norwood was not one of the three men who committed the robbery, and sought to create a reasonable doubt

---

[*] Sitting by designation pursuant to Del. Const. Art. IV § 12.

[1] These facts are drawn from the record below.

about Norwood's guilt by arguing that the third man was actually another person.

The same Family Dollar store had been robbed before. A few minutes before 9 p.m. on August 18, 2012, two men entered the store with masks on their faces, and armed with a handgun and a large knife.[2] The men took $1,451.11 from the register. On August 27, 2012, only nine days later, there was an attempted robbery of the same Family Dollar store. A man wearing a handkerchief over his face walked up to the door of the store a few minutes before 9 p.m. and brandished a handgun.[3] But the employees who were working that night, Rebecca Chillas and Martha Lewis, had already locked the door to close the store. The man pointed the gun at them and tried to get them to open the door, but they did not open it, and the man got into a car and left. When describing the man to the police, "Lewis stated that she is 5′3″ and that this male was a little taller than she is and thin." [4]

Just before 7 p.m. on September 4, 2012, only eight days after the attempted robbery, three men entered the Family Dollar. Chillas and Lewis were the only employees working and there were no customers in the store at the time. The perpetrator who we will call the "first man" had a mask tied around his face and was holding a gun. The perpetrator who we will call the "second man" was a teenager who was wearing a green shirt and camouflage shorts, and he was not wearing a mask. The perpetrator who we will call the "third man" was wearing a black ski mask.

The first man grabbed Lewis, put the gun to her head, and told her to open the register.[5] Lewis told the first man that she did not have a key to the register. Then the first man ran over to grab Chillas, but the third man stayed with Lewis and made her get down on her knees in the candy aisle.[6] The first man pulled Chillas off the step stool she was standing on, pointed the gun at her, and brought her to the front of the Family Dollar to open the register.[7] Chillas had some problems putting her manager code into the register, and the first man yelled that if she didn't hurry up, then he was going to shoot her.[8] Meanwhile, the second man took packs of cigarettes and cigars from a cabinet behind the register and stuffed them into a shopping bag.[9] The first man asked Chillas about opening the safe, but determined that it would take too long to open because it was on a timer.[10] The three men left the Family Dollar with $403.25 from the register and a shopping bag full of cigarettes and cigars worth a total value of around $200.[11]

---

2. Appendix to Norwood's Opening Brief at A153.

3. Appendix to Norwood's Opening Brief at A161.

4. Appendix to Norwood's Opening Brief at A161.

5. Appendix to Norwood's Opening Brief at A6–7.

6. Appendix to Norwood's Opening Brief at A9–10.

7. Appendix to Norwood's Opening Brief at A32–33.

8. Appendix to Norwood's Opening Brief at A10; *id.* at A36–37.

9. The second man mostly grabbed Newport soft packs and Swisher Sweet singles cigars. Appendix to Norwood's Opening Brief at A48.

10. Appendix to Norwood's Opening Brief at A39.

11. Appendix to Norwood's Opening Brief at A83.

After the three men left, Chillas and Lewis called the police. Chillas described the three robbers to the dispatcher, specifically noting that the second man was wearing a green shirt and camouflage shorts.[12] Corporal Lance Chandler of the Dover Police Department heard the dispatch about the armed robbery while he was out on patrol. Within minutes of the dispatch, Corporal Chandler reported to a foot path that connected Bay Court Plaza to the Capital Park housing development, because he thought that the suspects might use the foot path to escape. Corporal Chandler saw three men walking on the foot path, although during cross examination he admitted that it was possible there were four.[13] One of the men was wearing a green shirt and camouflage shorts matching the description of the second man provided by the dispatcher. Corporal Chandler radioed other units that he thought he had spotted the suspects and began to pursue them. When the suspects noticed Corporal Chandler, they ran.

The other men got away, but Corporal Chandler drew his gun on one of the men and ordered him to the ground. That man was the defendant, Cameron Norwood. As Norwood was getting down on the ground, he threw something away from himself. Corporal Chandler recovered the object and discovered that it was a black ski mask. The Police inspected the foot path where Norwood was arrested and found a black longsleeve t-shirt in the bushes along the foot path.[14] The Police did not run DNA tests on either the ski mask or the t-shirt. The Police also found an unopened pack of Newport cigarettes and two $1 bills on the foot path.

Norwood was taken into custody, and driven back to the Family Dollar, where Lewis identified the ski mask as the one that the third man was wearing during the robbery. Whether Lewis identified Norwood as the third man is not clear from the record. The Chief Investigating Officer testified that Chillas and Lewis were only able to identify the ski mask, and that "[Chillas and Lewis] could not immediately say that that was the person that had just robbed them based on his facial, so forth, because they indicated to me that he was wearing a mask at the time."[15] But Lewis testified that:

> [The police] had an individual in custody, Mr. Cameron, and they brought him back to the store in the police car and I was sitting in the police car. And he showed me the mask, and he asked me was this what one of the suspects was wearing. And I said, Yes, that was one of the masks that he was wearing. And from the top up—I could see his clothing up top and the clothing were the same as what the suspect was wearing.[16]

When Lewis was asked, "Based on what you saw in the store that night, isn't it true that you can't identify Mr. Norwood as the third person in that store?" Lewis responded, "Not while he was at the store. I can't identify him being in the store, but when the cops brought him back I could identify him when I saw him in the car."[17]

Lewis testified that the third man was between 5′4″ and 5′8″ in height, but was

---

12. Appendix to Norwood's Opening Brief at A40.

13. Appendix to the State's Answering Brief at B–6.

14. Appendix to Norwood's Opening Brief at A172.

15. Appendix to Norwood's Opening Brief at A71.

16. Appendix to Norwood's Opening Brief at A14.

17. Appendix to Norwood's Opening Brief at A29.

closer to 5′4″, with a thin-build, and weighing approximately 145 or 150 pounds.[18] Lewis said the third man was wearing a dark short-sleeve t-shirt and jeans, and Lewis did not remember him having any tattoos on his arms.[19] Lewis said that she could not see whether the third man had any hair or tattoos on his face because of the ski mask he was wearing.[20] There is record evidence that would support a conclusion that Norwood is 5′11″ (seven inches taller than 5′4″), has heavily tattooed arms, and was wearing a white tank top when he was arrested (not a dark short-sleeve t-shirt).

Corporal Jeffrey Davis of the Dover Police Department also responded to the dispatch about the robbery. Over the radio, Corporal Davis heard Corporal Chandler say that the suspects were on the path behind the DMV. Corporal Davis reported to one of the spots where the foot path ends in Capital Park. Corporal Davis saw a teenager in a green shirt and camouflage shorts, matching the description of the second man, run out from behind a house near the foot path and jump into the back of a vehicle.[21] Corporal Davis pursued the vehicle. After a brief chase, the vehicle pulled over and the teenager, Khareim Hanzer, was arrested at gunpoint. Hanzer was driven back to the Family Dollar, where Chillas and Lewis identified him as the second man. The police also found Hanzer's fingerprints on a cigar package

that had been dropped on the floor of the Family Dollar during the robbery.

The first man, who had been holding the gun, escaped and was not apprehended that night. But the police found fingerprints on the unopened pack of Newport cigarettes from the foot path, and matched them to Orlando Ingram. Ingram was arrested on September 27, 2012, and he had a gun in his possession that matched the description of the one that the first man used in the robbery.[22] Ingram is 5′8″ and weighs 170 pounds.[23]

During an interview, Hanzer admitted that he and Ingram were involved in the September 4, 2012 robbery of the Family Dollar. Hanzer said that Norwood participated in the September 4, 2012 robbery and was the third man wearing the black ski mask.[24] Hanzer also admitted that he had also been involved in the August 18, 2012 robbery and August 27, 2012 attempted robbery of the same Family Dollar store. Hanzer said that those other crimes were committed with Ingram and a man named Khalil Dixon, and that Norwood was not involved.[25] Hanzer was not called to testify at Norwood's trial.

Dixon is 5′5″, weighs 120 pounds, and more closely matches Lewis's description of the third man involved in the September 4, 2012 robbery than Norwood.[26] In addition, on April 17, 2013, Dixon pled guilty to committing several other recent robberies

18. Appendix to Norwood's Opening Brief at A17–18.

19. Appendix to Norwood's Opening Brief at A19–20.

20. Appendix to Norwood's Opening Brief at A18–19.

21. Appendix to Norwood's Opening Brief at A173. The police later determined that Hanzer did not know the people in the car, and that this was an act of carjacking. *Id.*

22. Appendix to Norwood's Opening Brief at A159; *id.* at A168.

23. Appendix to Norwood's Opening Brief at A163.

24. Appendix to Norwood's Opening Brief at A174.

25. Appendix to Norwood's Opening Brief at A165.

26. Appendix to Norwood's Opening Brief at A163; *id.* at A219

with Ingram and Hanzer, including the August 18, 2012 robbery of the same Family Dollar.[27] Hanzer, Ingram, and Dixon all live close to each other in Dover, but Norwood lives nearly an hour away in Lewes.[28] No other fingerprints were found that could be used to identify the third man involved in the September 4, 2012 robbery.

Norwood was charged with robbery first degree, possession of a firearm during the commission of a felony, wearing a disguise during the commission of a felony, and conspiracy second degree. Norwood chose not to testify at his jury trial in the Superior Court. Norwood raised a defense of actual innocence, and through defense counsel argued that he had been misidentified as the third man and that he found the black ski mask on the foot path and picked it up.[29] Defense counsel suggested that Dixon was actually the third man who participated in the September 4, 2012 robbery. In other words, the relevant question at trial was the identity of the third man: Was it Norwood, or was there a reasonable doubt that it could have been Dixon, who had admitted to committing similar robberies during the same time period with Ingram and Hanzer?

But when Norwood tried to introduce evidence about Dixon's involvement in the August 18, 2012 robbery and the August 27, 2012 attempted robbery of the Family

Dollar, the State objected to the line of questioning as irrelevant, confusing, and misleading.[30] The Superior Court sustained the objection, stating:

> "The State has no obligation to prove the identity. The State's done it by putting in the evidence that it has put in. You're trying to elicit evidence that somebody else, at some other point, may have attempted a robbery at the same place. I don't think it has any meaning." [31]

The evidence was not admitted. The jury found Norwood guilty of all charges except possession of a firearm during the commission of a felony.

## III. ANALYSIS

In this appeal, Norwood argues that the Superior Court should not have excluded the evidence about Dixon's involvement in the August 18, 2012 robbery and the August 27, 2012 attempted robbery of the same Family Dollar. The State claims that the evidence was excluded by Delaware Rule of Evidence 404(b), irrelevant under Rule 402, and "confusing and misleading" under Rule 403. We review the Superior Court's evidentiary rulings for abuse of discretion.[32] "An abuse of discretion occurs when 'a court has . . . exceeded the bounds of reason in view of the circumstances,' [or] . . . so ignored rec-

27. Appendix to Norwood's Opening Brief at A141–148. The August 18, 2012 robbery and the August 27, 2012 attempted robbery of the Family Dollar were part of a string of robberies committed by Ingram, Dixon, and Hanzer, including robberies of a Dollar General on August 30, 2012 (Appendix to Norwood's Opening Brief at A185; *id.* at A211–15), and Goose Creek Food Store on August 28, 2012 (Appendix to Norwood's Opening Brief at A196–207), among others. Dixon was also implicated in the September 20, 2012 robbery of the DOT Discount Tobacco (Appendix to Norwood's Opening Brief at A231–32).

28. Appendix to Norwood's Opening Brief at A170; *id.* at A202–203.

29. Appendix to Norwood's Opening Brief at A95, *id.* at A175.

30. Appendix to Norwood's Opening Brief at A100–102.

31. Appendix to Norwood's Opening Brief at A102.

32. *Watkins v. State,* 23 A.3d 151 (Del.2011); *Smith v. State,* 913 A.2d 1197 (Del.2006).

ognized rules of law or practice ... to produce injustice." [33]

The precise rationale for the Superior Court's exclusion of the evidence is not clear from the record. The Superior Court appeared to bar the evidence on relevancy grounds, stating only that "I don't think it has any meaning." [34] For the reasons explained below, we conclude that the Superior Court abused its discretion when it excluded the evidence about Dixon's involvement in the August 18, 2012 robbery and the August 27, 2012 attempted robbery of the same Family Dollar.

## A. The Standards Of Admissibility That Apply To The Admission Of Rule 404(b) Evidence Offered By A Defendant

■ Delaware Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But Rule 404(b) continues by stating, "that type of evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *identity* or absence of mistake or accident." [35] The first part of Rule 404(b) is based on "the concern that upon hearing evidence of prior bad acts, a jury would infer that because the defendant acted in such a way in the past, the defendant would be likely to have acted in

a similar way in the case at bar." [36] The second part of Rule 404(b) provides for the admission of evidence of prior bad acts if they are not offered to prove propensity to commit the crime; in other words, if the evidence is not offered for the purpose of suggesting an inference that the defendant acted consistently with those prior bad acts. The list of proper purposes authorized by Rule 404(b) is "illustrative and inclusionary." [37]

■ Rule 404(b) evidence "is typically used by prosecutors seeking to introduce evidence of a criminal defendant's prior misconduct as proof of motive or plan to commit the crime at issue." [38] In *Huddleston v. United States*, the United States Supreme Court, interpreting the analogous federal rule, articulated four requirements for the admissibility of evidence under Rule 404(b) that apply in that common circumstance.[39] The four requirements act as safeguards to ensure that the evidence does not unfairly prejudice the defendant against whom it is presented: (1) the evidence must be offered for a proper purpose as outlined in Rule 404(b); (2) the evidence must meet the relevancy requirement imposed by Rule 402; (3) the evidence must pass the Rule 403 balancing test to ensure that its probative value is not substantially outweighed by its potential prejudice to the defendant; and (4) there must be a limiting instruction to the

**33.** *Lilly v. State*, 649 A.2d 1055, 1059 (Del. 1994) (quoting *Firestone Tire & Rubber Co. v. Adams*, 541 A.2d 567, 571 (Del.1988)).

**34.** Appendix to Norwood's Opening Brief at A102

**35.** D.R.E. 404(b) (emphasis added).

**36.** Zachary El–Sawaf, *Incomplete Justice: Plugging the Hole Left by the Reverse 404(b) Problem*, 80 U. Cin. L.Rev. 1049, 1053 (2012); *see also* Jessica Broderick, *Reverse 404(b) Evidence: Exploring Standards When Defendants*

*Want to Introduce Other Bad Acts of Third Parties*, 79 U. Colo. L.Rev. 587 (2008).

**37.** *Smith v. State*, 913 A.2d 1197, 1227 (Del. 2006) (citing *Pope v. State*, 632 A.2d 73, 76 (Del.1993) (internal quotations omitted)).

**38.** *Smith v. State*, 913 A.2d 1197, 1227 (Del. 2006) (quoting *United States v. Seals*, 419 F.3d 600, 606 (7th Cir.2005)).

**39.** 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

jury regarding the particular purpose for which the evidence may be used.[40]

██ But because Rule 404(b) addresses "[e]vidence of other crimes, wrongs or acts ... of *a person*," a defendant can also seek to introduce evidence of the prior bad acts of some third party if that evidence tends to negate the defendant's guilt of the crime charged.[41] "Such evidence is most commonly introduced by a defendant to show that someone else committed a similar crime or series of crimes, implying that he or she also must have committed the crime in question."[42] This type of evidence is sometimes referred to colloquially as "reverse 404(b) evidence."[43] "In contrast to ordinary 'other crimes' evidence, which is used to incriminate criminal defendants, 'reverse 404(b)' evidence is utilized to exonerate defendants."[44] Here, Norwood sought to introduce reverse 404(b) evidence of Dixon's prior robberies with Ingram and Hanzer to argue that Dixon was the third man who participated in the Family Dollar robbery. Introducing reverse 404(b) evidence to prove identity is a proper purpose.[45]

██ The question then becomes how similar the prior crimes must be to the crime in question to be probative of identity. "In order to be admissible, 'evidence of prior bad acts must be logically related to the material facts of consequence to the case.'"[46] But when the defendant himself is seeking to introduce the evidence, prejudice to the defendant is not an issue and the policy justification for all the safeguards articulated by the United States Supreme Court in *Huddleston* for when Rule 404(b) evidence is used against a defendant facing conviction does not apply. This fact has led to a split in the courts about how to assess the admissibility of reverse 404(b) evidence. Some courts, including the Second and Third Circuit Courts of Appeals, have held that "a lower standard of similarity should govern reverse 404(b) evidence because prejudice to the defendant is not a factor."[47] The Third Circuit Court of Appeals has explained that:

> the same time by some other person"); *see also* Stephen A. Saltzburg, *Reverse Rule 404(b) Evidence: Part I*, CRIM. JUST. at 42 (Spring 2006).

**40.** *Id.* at 691–92, 108 S.Ct. 1496 (1988); *see also United States v. Mastrangelo*, 172 F.3d 288, 294–95 (3d Cir.1999).

**41.** 2 WIGMORE, WIGMORE ON EVIDENCE § 304, at 252 (J. Chadbourn rev. ed. 1979) ("It should be noted that ["other crimes"] evidence may be also available to negative the accused's guilt. E.g., if A is charged with forgery and denies it, and if B can be shown to have done a series of similar forgeries connected by a plan, this plan of B is some evidence that B and not A committed the forgery charged. This mode of reasoning may become the most important when A alleges that he is a victim of mistaken identification.").

**42.** *United States v. Williams*, 458 F.3d 312, 315–16 (3d Cir.2006).

**43.** 2 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[4] (2d ed.2014) (noting that "[a] defendant, in order to prove mistaken identity, may show that other crimes similar in detail have been committed at or about

**44.** *United States v. Stevens*, 935 F.2d 1380, 1402 (3d Cir.1991).

**45.** D.R.E. 404(b) (providing that "[e]vidence of other crimes, wrongs or acts ... may, however, be admissible for other purposes, such as ... *identity* ....").

**46.** *Smith v. State*, 913 A.2d 1197, 1227 (Del. 2006).

**47.** *United States v. Stevens*, 935 F.2d 1380, 1404–05 (3d Cir.1991); *see also United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir.1984) ("We believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword.").

[T]he defendant, in order to introduce other crimes evidence, need not show that there has been more than one similar crime, that he has been misidentified as the assailant in a similar crime, or that the other crime was sufficiently similar to be called a "signature" crime. These criteria, although relevant to measuring the probative value of the defendant's proffer, should not be erected as absolute barriers to its admission.[48]

Thus, "a defendant may introduce 'reverse 404(b)' evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations."[49] But other courts have maintained that the same strict test for the admissibility of Rule 404(b) evidence that applies when the evidence is offered against the defendant in a criminal case, still applies even when the defendant himself is the proponent of the evidence and the prior bad acts are those of someone else.[50]

Much of the confusion in the federal cases, properly understood, is not about the meaning of Rule 404(b) itself. Rather it is about the potential for undue prejudice that evidence of prior bad acts being offered for a purpose authorized by Rule 404(b) creates when it is to be used against a defendant facing a potential conviction for specific crimes before a jury.[51] In that

circumstance, it is important that the Rule 403 balancing be conducted in an exacting manner and that the Court be convinced that the evidence has a probative value that is specific and not substantially outweighed by the serious risk of prejudice that exists in that context.

The standard to apply for the admissibility of reverse 404(b) evidence is a question of first impression for this Court. The issue was discussed but not decided in *Smith v. State*.[52] We now adopt an approach similar to that taken by the Second and Third Circuit Courts of Appeals. The safeguards that have been articulated to address the admissibility of Rule 404(b) evidence in *Huddleston* and its progeny were created to protect a defendant against the risk of being punished for his prior bad acts, instead of the crime for which he is being prosecuted, or on the idea that if the defendant definitely committed prior crimes, then he probably committed this one and deserves to be convicted even if there is a reasonable doubt. The danger in that context is palpable. Put plainly, a jury may be convinced by a prior bad act that the defendant is a bad person deserving of punishment, but not that he committed the precise crimes with which he is being charged beyond a reasonable doubt. By contrast, when the per-

---

**48.** *United States v. Stevens*, 935 F.2d 1380, 1405 (3d Cir.1991).

**49.** *United States v. Stevens*, 935 F.2d 1380, 1405 (3d Cir.1991).

**50.** *See, e.g., United States v. Lucas*, 357 F.3d 599 (6th Cir.2004); *Agushi v. Duerr*, 196 F.3d 754 (7th Cir.1999).

**51.** *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ("... [E]vidence of similar acts has a grave potential for causing improper prejudice. For instance, the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the

defendant is an evil person inclined to violate the law."); *see also* 2 EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 10:44 (2013) ("One of the primary justifications for excluding evidence of the defendant's misconduct is the danger of prejudice; the courts cautiously evaluate the probative value of the defendant's uncharged misconduct because the evidence may tempt the jury to convict on an improper basis. That danger is largely absent when the misconduct is a third party's misdeed.") (internal citations omitted).

**52.** 913 A.2d 1197 (Del.2006).

son against whom the evidence is presented is not the defendant in the case, but rather a third party who is not in jeopardy, then the risk of potential prejudice from admitting that evidence is substantially less. That will necessarily affect the outcome of the balancing test required by Rule 403.

 Thus, in a situation involving so-called reverse 404(b) evidence, the trial judge should examine: (1) whether the evidence is being offered for a purpose permitted by Rule 404(b); (2) whether the evidence is relevant under Rule 402; and (3) any argument by a party that the probative value of the evidence is substantially outweighed by potential prejudice, undue delay, or confusion of the issue under Rule 403. Absent a specific request by a party for a case-specific reason, the admission of reverse 404(b) evidence at the request of the defendant does not require any automatic limiting instruction to the jury.

## B. The Evidence Was Admissible Because It Was Relevant To The Defense And There Was No Threat Of Prejudice Substantially Outweighing Its Probative Value

We now apply this framework to the Rule 404(b) evidence that Norwood sought to admit at trial. As discussed, Norwood sought to introduce Rule 404(b) evidence of Dixon's prior bad acts for the proper purpose of identifying Dixon as the third man involved in the robbery of the Family Dollar on September 4, 2012. Thus, the next question becomes whether the evidence met the more general requirement of relevance, because under Rule 402, "irrelevant evidence is generally inadmissible." [53]

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [54] To determine whether evidence is relevant, this Court will look to the purpose for which the evidence is offered. [55] To be considered relevant, the purpose for which the evidence is offered must be material and probative. [56] Evidence is material if the fact it is offered to prove is "of consequence" to the action. [57] Evidence has probative value if it "advances the probability" that the fact is as the party offering the evidence asserts it to be. [58]

 Here, Norwood's only defense at trial was misidentification. "Where a defendant in a criminal case claims he or she was not the one who committed the crime, a central issue, or ultimate fact, necessarily becomes the identity of the perpetrator." [59] Whether Lewis was mistaken in

---

53. D.R.E. 402.

54. D.R.E. 401.

55. *Kiser v. State*, 769 A.2d 736, 740 (Del. 2001).

56. *Kiser v. State*, 769 A.2d 736, 740 (Del. 2001); *see also Watkins v. State*, 23 A.3d 151, 155 (2011) ("We have explained that the definition of relevance encompasses materiality and probative value.") (citing *Stickel v. State*, 975 A.2d 780, 782 (Del.2009)).

57. *Watkins v. State*, 23 A.3d 151, 155 (2011); *see also Getz v. State*, 538 A.2d 726, 731

(Del.1988) ("Materiality looks to the relation between the propositions for which the evidence is offered and the issues, or ultimate facts, in the case.").

58. *Watkins v. State*, 23 A.3d 151, 155 (2011); *see also Getz v. State*, 538 A.2d 726, 731 (Del.1988) ("Probative value is concerned with the tendency of the evidence to establish the proposition that it is offered to prove.").

59. *Kiser v. State*, 769 A.2d 736, 740 (Del. 2001).

her identification of Norwood as the third man who participated in the September 4, 2012 robbery of the Family Dollar was the central issue in the case. The evidence of Dixon's involvement in the August 18, 2012 robbery and the August 27, 2012 attempted robbery of the same Family Dollar store had the potential to bolster Norwood's misidentification defense by creating a reasonable doubt about whether Norwood was the third man. Therefore, the evidence was material.

The evidence offered also had probative value. Although there were minor differences between the crimes, the details of the robberies were unusually similar, including the fact that the same Family Dollar store was robbed, the crimes occurred within weeks of each other, Hanzer and Ingram were also involved, the same gun was used, the men wore masks, and the robberies occurred in the evening near closing time.[60] Given the many similarities between the crimes, the evidence about the other robberies makes it more probable that Dixon, instead of Norwood, was the third man who participated in the September 4, 2012 robbery and it was therefore probative. "[W]here a defendant invokes the defense of misidentification, 'relevant misidentification evidence is highly probative of a material issue in the case.'"[61] Thus, because the evidence offered was both material and probative, it was relevant and admissible unless it was otherwise barred by rule or statute.[62]

Under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."[63] There is no risk of unfair prejudice to Norwood, because he is the one seeking to introduce the evidence, and the State failed to articulate any prejudice to it, other than having to address the evidence on its merits. The introduction of the evidence at trial created no serious risk of undue delay, because the evidence was contained in police reports and would not have taken long to present at trial. And there is no reason to believe that the evidence would have confused the jury about the real issue in the case, which was the identity of the third man who participated in the September 4, 2012 robbery of the Family Dollar. Thus, the probative value of the evidence about Dixon's involvement in the August 17, 2012 robbery and the August 28, 2012 attempted robbery of the same Family Dollar store was not substantially outweighed by any prospect of undue delay or confusion of the issues, and the evidence should have been admitted.

## IV. CONCLUSION

The State did not argue in its briefs that any error was harmless, and at oral argument, the State conceded that if we determined that the exclusion of the evidence was error, that the error could not be harmless. For the reasons explained above, we conclude that the Superior Court abused its discretion when it excluded the evidence of Dixon's involvement in the August 18, 2012 robbery and the Au-

---

60. Appendix to Norwood's Opening Brief at A153.

61. *Watkins v. State,* 23 A.3d 151, 155 (Del. 2011) (quoting *Kiser v. State,* 769 A.2d 736, 740 (Del.2001)).

62. *Kiser v. State,* 769 A.2d 736, 739 (Del.2001) (citing D.R.E. 402).

63. D.R.E. 403.

gust 27, 2012 attempted robbery of the Family Dollar. Therefore, the judgment of convictions entered by the Superior Court on June 27, 2013 is REVERSED and this case is REMANDED to the Superior Court for a new trial.