SUPERIOR COURT
OF THE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

February 19, 2020

Michael H. Tipton, Esquire
Department of Justice
114 East Market Street
Georgetown, DE 19947

Brian T. Jordan, Esquire
Jordan Law, LLC
704 North King Street, Suite 600
Wilmington, DE 19801

Cleon L. Cauley, Sr., Esquire
The Cauley Firm
One Customs House
704 North King Street, Suite 600
Wilmington, DE 19801

Natalie S. Woloshin, Esquire
Woloshin, Lynch & Associates, P.A.
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803-7329

Re:   *State of Delaware v. Richard Aiken*
      Def. ID# 1507021054A
      Motion for Postconviction Relief – R1

Dear Counsel:

This is my decision on a timely first Amended Motion for Postconviction Relief (the "Motion") filed by Defendant Richard Aiken ("Aiken"). Aiken and his co-defendant, Marcie Karr ("Marcie"), were charged with a series of burglaries that occurred in the summer of 2015 in Sussex County, Delaware. Marcie plead guilty and testified against Aiken at trial. Aiken was ultimately convicted of two counts of Burglary in the Second Degree (and related counts of Theft, Criminal Mischief

and Witness Tampering) and one count of Conspiracy in the Second Degree. The burglary convictions are related to two separate burglaries, the Cox burglary (the "Cox Burglary") and the Elliott burglary (the "Elliott Burglary") (collectively, the "Burglaries"). This prosecution against Aiken began when Probation and Parole officers visited a camper occupied by Dwayne Karr ("Dwayne"), who was on probation. The officers found Aiken, who was also on probation, in the camper. The officers searched Aiken and found a brown bag in his pocket containing stolen jewelry. The officers found a black bag near where Aiken was sitting that also contained stolen items.

Before addressing the merits of the Motion, I first address the four procedural bars of Superior Court Criminal Rule 61(i).[1] If a procedural bar exists, as a general rule, I will not address the merits of the postconviction claim.[2] Under the Delaware Superior Court Rules of Criminal Procedure, a motion for post-conviction relief can be barred for time limitations, successive motions, failure to raise claims that could have been raised previously, or former adjudication.[3]

---

[1] *Ayers v. State*, 802 A.2d 278, 281 (Del.2002) (citing *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[2] *Bradley v. State*, 135 A.3d 748 (Del 2016); *State v. Page*, 2009 WL 1141738, at*13 (Del. Super. April 28, 2009).

[3] Super. Ct. Crim. R. 61(i).

First, a motion for postconviction relief exceeds time limitations if it is filed more than one year after the conviction becomes final, or if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right was first recognized by the Supreme Court of Delaware or the United States Supreme Court.[4] In this case, Aiken's conviction became final for purposes of Rule 61 at the conclusion of direct review when the Delaware Supreme Court issued its mandate on October 23, 2017. Aiken filed his *pro se* first motion for postconviction relief on December 4, 2017. Therefore, consideration of the Motion is not barred by the one-year limitation of Rule 61(i)(1). I note that the Motion was filed after the one-year limitation of Rule 61 (February 15, 2019). However, Superior Court judges have "discretion to permit defendants to amend their motions when justice so requires."[5]

Second, subsequent motions for postconviction relief are not permitted unless certain conditions are satisfied.[6] Since this is Aiken's first motion for postconviction relief, these restrictions do not apply.

Third, grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred unless the movant can show "cause for relief" and

---

4 Super. Ct. Crim. R. 61(i)(1).
5 *Ploof v. State*, 75 A.2d 811, 821 (Del. 2013).
6 Super. Ct. Crim. R. 61(i)(2).

3

"prejudice from [the] violation."[7]   This bar does not apply in this case (see discussion of ineffective assistance of counsel, below).

Fourth, grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[8]   This bar does not apply in this case (see discussion of ineffective assistance of counsel, below).

Aiken's Motion is based on claims of ineffective assistance of counsel.  It is well settled Delaware law that ineffective assistance of counsel claims may not be addressed by the Delaware Supreme Court on direct appeal.  Rather, such collateral claims are properly raised for the first time in postconviction proceedings.[9]   Thus the issues presented in the Motion could not be "asserted in the proceedings below" under Rule 61(i)(3) and thus were not "formerly adjudicated" under Rule 61(i)(4). As a result, the procedural bars under Rule 61(i)(3) and Rule 61(i)(4) do not apply.

Finally, the four procedural bars do not apply either to a claim that the Court lacked jurisdiction or to a claim that pleads with particularity that new evidence exists

---

7 Super. Ct. Crim. R. 61(i)(3).

8 Super. Ct. Crim. R. 61(i)(4).

9 *State v. Schofield*, 2019 WL 103862, at *2 (Del. Super. January 3, 2019); *Thelemarque v. State*, 2016 WL 556631, at *3 (Del. Feb. 11, 2016) ("[T]his Court will not review claims of ineffective assistance of counsel for the first time on direct appeal."); *Watson v. State*, 2013 WL 5745708, at *2 (Del. Oct. 21, 2013) ("It is well-settled that this Court will not consider a claim of ineffective assistance that is raised for the first time in a direct appeal.").

that creates a strong inference of actual innocence,[10] or that a new retroactively applied rule of constitutional law renders the conviction invalid.[11] None of these claims applies in this case.

Thus, none of the procedural bars under Rule 61 applies in this case, and I will consider Aiken's claims on the merits.

Aiken brings four claims of ineffective assistance of his trial co-counsel (collectively, "Trial Counsel"), which are assessed under the two-part standard established in *Strickland v. Washington*,[12] as applied in Delaware.[13] Under *Strickland*, Aiken must show that (1) Trial Counsel's representation "fell below an objective standard of reasonableness" (the "performance part"); and, (2) the "deficient performance prejudiced [his] defense" (the "prejudice part").[14] In considering the performance part, the *Strickland* Court was mindful that "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[15] *Strickland* requires an objective analysis, making every effort "to eliminate the distorting effects of hindsight" and to "indulge

10 Super. Ct. Crim. R. 61(i)(5).
11 Super. Ct. Crim. R. 61(d)(2)(i) and (ii).
12 466 U.S. 668 (1984).
13 *Albury v. State*, 551 A.2d 53 (Del. 1988).
14 *Id.* at 687.
15 *Id.* at 690.

5

a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16] Moreover, "strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."[17]

As to the performance part, Aiken must show that Trial Counsel's decisions (1) not to object to Officer McCabe's testimony about various stolen items found by police in either the brown bag found on Aiken's person or the black bag found on the camper floor where Aiken was arrested, (2) not to object to certain statements made by the prosecutor in closing, (3) not to question Marcie about her plea, and (4) not to challenge Aiken's conviction of Conspiracy in the Second Degree in the post-trial Motion for Judgment of Acquittal, were not reasonable strategic decisions. In my view, all of these decisions by Trial Counsel were strategically reasonable. Thus, Trial Counsel's strategic decisions do not amount to ineffective assistance of counsel, as discussed more fully below.

As to the prejudice part of *Strickland*, Aiken must demonstrate that there exists a reasonable probability that, but for Trial Counsel's unprofessional errors,

---

16 *Id.* at 689.
17 *Id.* at 681.

6

the outcome of the trial would have been different.[18] Even if Trial Counsel's performance were professionally unreasonable, it would not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[19] A showing of prejudice "requires more than a showing of theoretical possibility that the outcome was affected."[20] In my view, even if Trial Counsel's four strategic decisions were deemed to constitute ineffective assistance of counsel, the ultimate outcome of the trial would not have been different. Thus, Trial Counsel's strategic decisions did not prejudice Aiken's defense under the prejudice part of the *Strickland* test.

*Strickland* also teaches that there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in a particular order, or even to address both parts of the inquiry if the defendant makes an insufficient showing on one. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.[21] In every case, the court should be concerned with whether, despite the strong presumption of reliability, the

---

18 *Id.* at 687; *Zebroski v. State,* 822 A.2d 1038, 1043 (Del. 2003); *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).
19 *Strickland,* at 691.
20 *Frey v. Fulcomer,* 974 F.2d 348, 358 (3d Cir. 1992).
21 *Strickland,* at 697.

result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.[22]

## Argument One

First, Aiken argues that Trial Counsel failed to object to Officer McCabe's testimony about various stolen items on the basis that McCabe was unable to identify some of the stolen items and that photographs of those stolen items were not properly authenticated.  The Delaware Rules of Evidence provide:

> "To satisfy the requirements of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[23]

Under Delaware law, there must be a sufficient foundation for a jury to find that the evidence is what the proponent claims.[24]  Authentication can be satisfied by a witness with knowledge testifying that the item is what the proponent claims.[25] Aiken concedes that the burden of establishing such a foundation is a lenient one.

Aiken states that McCabe arrived on the scene after the stolen items had been laid out on the trunk of the Mercury Marquis, and thus had no first-hand knowledge about the items found by the police either in the brown bag found in Aiken's pants

---

22 *Id.* at 696.
23 D.R.E. 901(a).
24 *Mills v. State*, 2016 WL 152975 (Del. Jan 8, 2016).
25 D.R.E. 901(b)(1).

pocket or in the black bag found on the camper floor where Aiken was arrested. Aiken reasons that the State's case would have been much weaker, and therefore he would have been more likely to be acquitted of the Burglaries, if McCabe had been prevented from testifying about the stolen items found in the brown bag. Since the brown bag was found on Aiken's person, it was harder for Aiken to deny that the brown bag belonged to him. Moreover, he argues, Trial Counsel's failure to object to McCabe's testimony prejudiced his case on direct appeal because it prevented him from arguing that the stolen items were commingled.

In their Affidavits in response to the Motion, Trial Counsel state that they did not object to McCabe's testimony because they wanted to use McCabe's lack of knowledge to argue that the investigation of the Burglaries was shoddy and that there were inconsistencies and inaccuracies in his testimony. This was a reasoned part of their trial strategy. Delaware law provides that "a decision made in pursuit of reasonable trial strategy does not constitute ineffective assistance of counsel."[26] Both Trial Counsel and the State argue that Trial Counsel's strategy and actions were reasonable under the circumstances and therefore do not constitute ineffective assistance of counsel. I agree.

---

[26] *Ruffin v. State*, 2019 WL 719038, at *2 (Del. Feb. 19, 2019), citing *Allison v. State*, 2010 WL 373919 (Sept. 24, 2010); *Robertson v. State*, 38 A.3d 1255 (Table), 2012 WL 628001, at *4 (Del. Feb. 27, 2012).

9

I conclude that McCabe's lack of complete knowledge does not matter. The testimony of the various officers who searched the camper and car, the pictures of the bags and the stolen items, and common sense establish that McCabe's testimony was correct. Moreover, the problem with Aiken's argument is that the items stolen and recovered from the Burglaries were found in either the brown bag or the black bag, and *both* bags were linked to Aiken. The brown bag was found on Aiken's person, and both Dwayne and Marcie testified that the black bag belonged to Aiken. Marcie testified that Aiken used the black bag both to store his clothes and in at least one burglary. Thus, whether the stolen jewelry came from the brown bag or the black bag is of no consequence. This is established by the testimony summarized below and by trial exhibits 5, 6, 7, 8 and 9 (the photographs of the stolen items).

### Summary of Testimony

### Officer Hopkins

Probation and Parole Officer George Hopkins went to a camper located at 22831 Bunting Road in Georgetown, Delaware on July 16, 2015 (B-17 & 18).[27] Hopkins saw Aiken on a seat in the camper (B-19). Hopkins searched Aiken and found a brown colored canvas bag in his pants-pocket (B-21). Hopkins saw a black backpack next to the couch (B-37). Hopkins testified that there was some "random

---

[27] References are to the official Transcript of the Proceedings.

10

gold jewelry" in the brown bag (B-46). Aiken told Hopkins that the jewelry in the brown bag was stolen (B-46).

## Officer Glenn

Probation and Parole Officer Jason Glenn also went to the camper (B-48). Glenn saw the brown bag of jewelry that was located on Aiken (B-52). Glenn found a black book bag on the floor in the center of the camper (B-52). Glenn searched the black bag and found some drug paraphernalia, jewelry and watches in it (B-52). Glenn called Detective McCabe and told him that he found a gold firefighter's watch, class rings, and jewelry in the black bag (B-53-54). Glenn was shown at trial a picture that eventually became Exhibit 6 (B-54). Glenn testified that the picture showed the contents of the black bag. Exhibit 6 shows a number of items including watches, change and jewelry. Glenn testified that the black bag included drug paraphernalia, identification, clothes, jewelry, and a pill bottle (B-57). Glenn also testified that Exhibit 6 showed most of the items found in the black bag except for the pill bottle and identification (B-61). Glenn also testified the black bag had letters in it (B-83).

## Officer McCabe

Delaware State Police Officer Keith McCabe also went to the camper. Officer McCabe testified that Officer Glenn contacted him at home and told him that

11

he found a gold pulsar fire company watch (B-96). When McCabe arrived on the scene, he saw property taken from the search sitting on the trunk of a car (B-98 and Exhibit 5). This included a brown bag, a black bag, two pill bottles, a letter, coins, a cell phone, and other miscellaneous property (B-99). McCabe recognized a fire company watch and a Vallejo High School ring as being stolen (B-99). McCabe and another officer searched the camper (B-100). They found two Pandora bracelets, ear buds for an iPhone 6 and a Delaware I.D. Card for Kylee Davis (B-101). The two bracelets were found in a cupboard (B-102). McCabe looked at Exhibit 6, which is a picture he took of the black bag and various items. McCabe testified the items in the picture came out of the black bag (B-102). McCabe identified the fire company watch as coming from the black bag (B-103). McCabe looked at Exhibit 7, which is a picture he took of the brown bag found on the Defendant (B-104). McCabe testified that the items in the picture came from the brown bag (B-104). The items included class rings, a masonic ring, a bracelet with several rings on it, charms, and earrings (B-108). McCabe testified that a class ring and masonic ring came from separate burglaries three miles apart (B-109). McCabe also testified that the bracelet with rings on it came from the burglary where the class ring and the fire company watch were stolen (B-109). McCabe testified that the police searched a Mercury Marquis vehicle found at the scene that was registered to

12

Marcie's father and found a silver colored ring with a light green stone, another Pandora bracelet, a religious medallion, a black bag containing a laptop computer, a Samsung tablet, a Samsung Galaxy phone, and rubber gloves (B-110-111). McCabe testified that a Dagsboro fire company watch, a Vallejo High School ring and a bracelet with several rings on it that had been stolen from the Cox residence and that the ring and bracelet with rings on it were in the brown bag that was found on Aiken and that the watch was in the black bag (B-126-128). McCabe testified that a masonic ring and high school ring that were stolen from the Elliott residence were recovered (B-128). McCabe testified that the rings were in the brown bag (B-130-131). McCabe acknowledged that he did not have first-hand knowledge of what was in the black bag. Instead, he only knew what he was told. McCabe also acknowledged that he did not have first-hand knowledge of what was taken from the brown bag on Aiken's person.

### Victim Michelle Cox

Cox testified that she got her Vallejo High School ring, her husband's fire company watch, a bracelet with rings on it, charms, and several other items back (CC-180 and Exhibit 8).

13

## Victim Gordon Elliott

Elliott testified that he got his dad's masonic ring and his wife's Laurel High School ring back (CC-217 and Exhibit 9).

## Dwayne Karr

Dwayne Karr and his wife, Marcie Karr, lived in the camper (C-34). Dwayne owned the camper (C-34). Dwayne had been in a serious motor vehicle accident and was unable to drive a car or walk very far (C-34-35). Dwayne testified that the black bag found on the camper floor did not belong to him (C-36). Dwayne testified that it belonged to Aiken and that Aiken used it to carry his clothes when Dwayne and Marcie took Aiken to a motel room (C-36). Dwayne testified that he would occasionally see Aiken with the black bag (C-37). Dwayne also testified that the black bag did not belong to Marcie.

## Co-Defendant Marcie Karr

Marcie testified that she drove Aiken to Dagsboro (C-66). Marcie parked at a pizza place and Aiken got out (C-67-68). Aiken returned carrying a bag with him, got in the car, and told Marcie to leave (C-68). Marcie was shown Exhibit 11, which is the black bag found in the camper(C-68). Marcie testified that it was the bag that Aiken had with him when he returned to the car (C-69). Marcie added that

14

there were pills in the bag and that Aiken took some of them out and offered them to her (C-69).

## Summary of Photographs in Evidence

There were six distinctive pieces of jewelry that were stolen from the Cox Burglary and the Elliott Burglary and found by the police when they searched Aiken, the brown bag, the black bag, the camper, and the Mercury Marquis parked outside of the camper on July 16, 2015. A Vallejo High School ring, a fire company watch, a bracelet with rings on it, and various charms were stolen from Cox. A masonic ring and Laurel High School ring were stolen from Elliott. The four distinctive items were returned to Cox on August 3, 2015. The two distinctive items were returned to Elliott on August 3, 2015. The police searched four areas on July 16, 2015: Aiken and the brown bag that was found on him, the black bag found on the camper floor, the camper itself, and the Mercury Marquis parked outside the camper. The police found a brown bag in Aiken's pants pocket that had some random gold jewelry in it according to Officer Hopkins. The police found a black bag on the floor in the camper that had drug paraphernalia, jewelry and watches in it according to Officer Glenn. When shown Exhibit No. 6, which is a picture of the black bag and a number of items, Officer Glenn testified that the items shown in the picture came out of the black bag. The picture shows, among other things, several watches

15

and jewelry. It does not show any rings, or a bracelet with rings on it or charms. Officer Glenn testified that one of the items in the black bag was a gold firefighter's watch. The police searched the camper and found two Pandora bracelets in the cupboard. The police searched the Mercury Marquis and found a silver colored ring with a light green stone and another Pandora bracelet. The police found other items in the camper and Mercury Marquis, but no other jewelry. The jewelry that the police did find in the camper and Mercury Marquis were not stolen in the Cox and Elliott Burglaries. Thus, by process of elimination, the six distinctive items were found in either the brown bag or black bag.

This is further borne out by the pictures taken by the police of the stolen items they recovered on July 16, 2015. Exhibit 5 is a picture of the stolen property on the trunk of the Mercury Marquis. It shows the brown bag with jewelry still inside two plastic bags next to the brown bag and the black bag with watches and other items next to it.

### The Brown Bag

Exhibit 7 shows the brown bag, the now-emptied two clear plastic bags, a masonic ring, a bracelet with rings on it, two high school class rings, a number of charms, and other pieces of jewelry. The masonic ring and one of the high school class rings were returned to Elliott and are shown in Exhibit 9. Exhibit 7 and

16

Exhibit 9 both clearly show the masonic ring. Both pictures also show a class ring. The other high school class ring, bracelet with rings on it, and charms were returned to Cox and are shown in Exhibit 8. Exhibit 7 and Exhibit 8 both clearly show the bracelet with rings on it and the charms. Five charms are identifiable in both pictures (a heart, a double heart, a key, a cross and a butterfly). Both pictures also show a class ring.

### The Black Bag

Exhibit 6 shows the black bag, a fire company watch, and other items. The fire company watch was returned to Cox and is shown on Exhibit 8. Exhibit 6 and Exhibit 8 clearly show the same fire company watch in both.

In any event, the testimony of the three officers and the two victims and the pictures relate the six distinctive items to either the brown or the black bag. The pictures show five of the six distinctive items - the two class rings, the masonic rings, the bracelet with rings on it and the charms - next to the brown bag. The pictures show the sixth distinctive item - the fire company watch - next to the black bag.

I conclude that the pictures of the brown bag and their respective contents are reliable. Officer Glenn testified that Exhibit 6 was a picture of the black bag and its contents. Although no one testified that Exhibit 7 was a picture of the brown bag and its contents, the picture notes that the "items were found on Aiken's person,"

17

and the brown bag was found on Aiken's person. Common sense dictates that if there is a picture of a bag with items next to it, the logical conclusion is that the items came out of that bag. There is no plausible reason why the contents of the two bags would have been dumped out and commingled before taking photographs of each bag and its contents separately. Aiken's argument in this regard strains credulity and has no testimonial or logical support. When asked about this, Officer Glenn testified that he took the items out of the black bag and set them down on the floor close to the bag. There is no mention at all of him taking the items out of the brown bag and commingling them with the items that came out of the black bag.

## Conclusion

I conclude that Officer McCabe testified correctly that the two class rings and masonic ring, and bracelet with rings on it came from the brown bag and that the fire company watch came from the black bag. Even assuming commingling, it remains clear that the jewelry taken in the Cox Burglary and the Elliott Burglary was found in the brown and black bags, and both of those bags were linked to Aiken. The police found nothing in either the camper or the Mercury Marquis that was stolen in the Cox Burglary or the Elliott Burglary. Both Dwayne and Marcie linked the black bag to Aiken. Dwayne testified that the black bag found in the camper did not belong to him or Marcie. Instead, he testified that it belonged to Aiken and that the

18

Aiken used it to carry his clothes. Indeed, the black bag had Aiken's clothes in it. Marcie testified that, after she took Aiken to one of the burglaries in Dagsboro near the pizza place, he came back with the black bag in his hand and took a pill bottle out of it. Marcie identified Exhibit 11 as a picture of the black bag. Moreover, the black bag is logically related to Aiken. Aiken did not live in the camper and the Mercury Marquis did not belong to him. Thus, it would not make any sense for him to store his valuable items in either the camper or the car. Instead, it would make much more sense for Aiken to store his items in the black bag, which is exactly what he did, and in the brown bag, which he kept on his person.

## Argument Two

Second, Aiken argues that Trial Counsel failed to object to two instances of prosecutorial misconduct relating to statements in the State's closing argument. The first instance was the prosecutor allegedly mischaracterizing the evidence by arguing to the jury that victim Michelle Cox identified Aiken as fleeing from her house at the time of the burglary. The second instance was the prosecutor allegedly improperly bolstering or vouching for Marcie.

In their Affidavits, Trial Counsel state that they did not object to either argument by the prosecutor because they believed that the arguments were within permissible limits.

19

The Delaware Supreme Court has discussed the permissible bounds of comment by the prosecution generally:

> "Not every improper remark by a prosecutor requires reversal, but only that which prejudicially affects substantial rights of the accused. Super. Ct. Crim. R. 52(a); *Edwards v. State*, 320 A.2d 701 (Del. 1974). Although the prosecutor operates within an adversary system, his duty is to seek justice, not merely convictions.
>
> A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial. *Bennett v. State*, (3 Storey 36), 164 A.2d 442, 446 (Del. 1960). That same duty requires the prosecutor to refrain from legally objectionable tactics calculated to arouse the prejudices of the jury."[28]

The Delaware Supreme Court has also has discussed the permissible bounds of comment by the prosecution in closing argument specifically:

> "The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial. He is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from that evidence. The prosecutor, nevertheless, must remember his unique position within the adversary system."[29] [Internal Citations Omitted]
>
> "Closing argument is an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound. (T)he process of constitutional line drawing in this regard is necessarily imprecise .... Indeed, it is frequently difficult to ascertain whether courts are speaking of errors so fundamentally unfair as to deny

---

28 *Sexton v. State*, 397 A.2d 540, 544 (Del. 1979)
29 *Hooks v. State*, 416 A.2d 189, 204-05 (Del. 1980).

20

the defendant due process or whether courts are merely exercising their supervisory power to curtail prosecutorial misconduct. But, in either event, the ethics of the legal profession are in issue...."[30] [Internal Citations Omitted]

The ABA Standards for Prosecution Functions address both portions of the State's closing argument to which Aiken objects:

"5.8 Argument to the jury.
(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."[31]

## Identification

Aiken argues that the prosecutor's statement in his closing argument that Michelle Cox's testimony put Aiken at the scene, when coupled with his statement that Cox saw Aiken running, constitute an identification of Aiken by Cox, when in fact Cox did not identify Aiken. The State argues that the statements were proper, and, even if they were improper, there was no plain error under Delaware law.

The following is the prosecutor's complete statement on this issue, not just the snippet cited by Aiken in his Motion:

30 *Bennett v. State*, 3 Storey 36, 164 A.2d 442, 446 (1960).
31 ABA Standards, the Prosecution and Defense Functions (1971).

21

"There is stuff that ties Mr. Aiken back to these crimes. He's found with the jewelry. And Marcie puts him there.

Ms. Cox's residence, not only does Marcie put him there, Ms. Cox puts him there. She comes home. She drives past her driveway so she can back in and sees the abandon[ed] building, which she was very specific about. Ten days that building had been abandoned. She was just wondering why there would be a car parked there. So she notices it. She notices the color. She notices that there is a female behind the driver's seat and that the person is on the phone. She pulls into her driveway to what I'm assuming she felt was a safer distance, gets out of her car, walks to the front, and sees Mr. Aiken running. She doesn't know Mr. Aiken. She sees a man hunched over carrying something and she gets to see basically from his knees to his feet. She identifies him as being a white male with hairy legs." (E-82)[32]

The prosecutor was making two points. One, there was jewelry found on Aiken that came from the Cox Burglary. Two, Marcie's testimony put Aiken at the Cox Burglary and Michelle Cox's testimony put Aiken at the Cox Burglary as well. Taken in its entirety, I find no error with the prosecutor's statements. He is simply arguing that the evidence and Michelle Cox's testimony put Aiken at the Cox residence at the time of the Cox Burglary. The prosecutor is drawing reasonable inferences from Michelle Cox's testimony, inferring that Aiken was the person

32 References are to the official Transcript of the Proceedings.

22

running away from the Cox residence. The prosecutor's statements taken as a whole make it clear what Michelle Cox saw a white male with hairy legs hunched over and carrying something. The prosecutor did *not* argue to the jury that Michelle Cox had actually identified Aiken as the man running away from the Cox residence. Thus, the prosecutor did not mischaracterize the evidence. The statements were proper.

Having found the State's closing statements to be proper, there is no need for me to discuss whether Aiken's rights have been substantially violated by improper statements under the tests of *Hughes v. State*[33] and *Hunter v. State*.[34]

### Vouching/Bolstering

Aiken argues that a statement by the prosecutor in his closing argument improperly bolstered Marcie's testimony and vouched for her credibility. The State argues that the statement was proper and, even if it was improper, there was no plain error under Delaware law.

Under Delaware law, it is improper for a lawyer to vouch for a witness or to bolster the testimony of a witness.[35] This is especially true when the credibility of

---

33 437 A.2d 559 (Del. 1981).
34 815 A.2d 730 (Del. 2002).
35 *Brokenbrough v. State*, 522 A.2d 851, 855 (Del. 1987); Del. Lawyers' R. Prof'l Conduct 3.4(e).

23

the witness is the subject of the vouching or bolstering, "because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness."[36] On the other hand, as discussed above, the prosecutor may argue all reasonable inferences from the evidence and testimony of record, so long as he does not express his personal belief or opinion as to the truth or falsity of any testimony or evidence.

The following is the prosecutor's complete statement on this issue:

> "And Marcie then basically says the same thing. She says she's parked there. He got out. A couple minutes later he came running and got back into the car. He had a bag. He opens the bag. He says, go. So they get out of there. As they are leaving, he opens the bag and they start to snort pills. He opens the black bag and he starts to snort pills. How would Marcie know about the pills and the bag and how it ties back to the Cox residence unless that is true? She wouldn't." (E-83)

The prosecutor's statement was made to demonstrate that Marcie's testimony regarding the Cox Burglary was credible. Michelle Cox had testified about two things that are relevant in this regard. First, Cox testified about returning to her home and seeing a woman sitting in a parked car at a closed pizza place on a property next to her residence. About 20 to 30 seconds later Cox saw a man "skulking" around the building next door, in a hoodie, shorts and tennis shoes. Cox testified

---

36 *Whittle v. State*, 77 A.3d 239 (Del. 2013).

that the man was holding some things in front of him and that he got in the car and it took off. Cox testified the car was maroon-colored. Cox described the man as white and having hairy legs. Second, Cox testified that three bottles of her pain medication were gone.

Marcie also testified about the same two things. Marcie testified that Aiken asked her for a ride to Dagsboro. Marcie parked at a pizza place. Marcie stated that the Mercury Marquis she drove was maroon-colored. Marcie testified that Aiken got out and then returned a few minutes later and got in the car with a bag in his hands and told Marcie to leave. Marcie identified the black bag that the police found in the camper as the bag that Aiken had with him. Marcie testified that after Aiken got back in the car he started going through the bag and pulled some hydrocodone pills out of it and asked Marcie if she wanted some. Marcie told Aiken that she did.

Considering the prosecutor's comments together with the testimony of Cox and Macie on this point, it is clear that there is no improper vouching or bolstering. The prosecutor is only pointing out that Marcie would not have known about the pills unless she was there when Aiken committed the Cox Burglary. Cox testified that the burglar took, among other things, her pain pills. Marcie testified that Aiken had returned to her car with a black bag that had pills in it. Given the testimony by Cox and Marcie about this happening when Marcie took Aiken to the pizza place, it

25

is clear that this implicates the Cox Burglary. The prosecutor's point is that Marcie would not have known about the pills unless she was actually there with Aiken when he committed the Cox Burglary. Moreover, Marcie's testimony is consistent with Cox's testimony. Unlike the *Whittle* case on which Aiken relies, the prosecutor did not tell the jury that Marcie was "right." The prosecutor's closing statement was proper.

Having found the State's closing statement to be proper, there is no need for me to discuss whether Aiken's rights have been substantially violated by improper statements under the tests of *Hughes* and *Hunter, supra.*

## Argument Three

Third, Aiken argues that Trial Counsel failed to cross-examine Marcie, the key witness against Aiken on the Cox Burglary and the Elliott Burglary, about her plea agreement in order to establish that she was biased against him. Aiken argues that this constitutionally deficient performance caused significant prejudice to Aiken and that the outcome of the case would have been different if cross-examination about the plea agreement had taken place.

Under Delaware law, "the bias of a witness is subject to exploration at trial and is 'always relevant as discrediting a witness and affecting the weight of his testimony.' Moreover, 'cross examination on bias is an essential element of the

constitutional right of confrontation.'"[37]   The "specifics of a plea agreement' are an appropriate subject of inquiry during cross examination."[38]

Marcie was initially charged as a co-defendant with the same crimes as Aiken, but she pled guilty to three misdemeanors and received a sentence of one year of level two probation.   At trial, Marcie gave testimony that both helped and hurt Aiken.

In their Affidavit, Trial Counsel state that they did not question Marcie about her plea because she had significant testimony *favorable* to Aiken, and thus they did not want to undermine her credibility as a State witness.   Trial Counsel's strategy was to use Marcie's testimony to show that Aiken was a traveling tattoo artist who accepted jewelry and other items in payment for tattoos.   In his Motion, Aiken is very dismissive of this strategy, but I believe that the issue is more nuanced than Aiken now suggests.   Marcie testified that (1) Aiken was a tattoo artist; (2) Aiken did not have his own shop or work for anyone else; (3) Aiken did a tattoo for her husband, Dwayne, and went to Dwayne's house to do it; (4) Aiken went to the Classic Motel and did tattoos for the people living there; (5) Aiken accepted jewelry in payment for tattoos; (6) Marcie sold some of Aiken's jewelry at pawn shops

---

37 *Wilson v. State*, 950 A.2d 634, 638 (Del. 2008), quoting *Van Arsdall v. State*, 486 A.2d 1, 6 (Del. 1984), *rev'd* on other grounds [Internal Citations Omitted]
38 *Id.,* at 639.

27

because Aiken did not have a driver's license; (7) Aiken got rides from Marcie; and (8) Aiken got jewelry from his sister. This testimony from Marcie provided Trial Counsel with an alternative explanation (i.e., other than burglary) as to why Aiken would be in possession of the jewelry.

On the other hand, Marcie offered testimony that hurt Aiken, or was at least mixed, with respect to the Cox Burglary and the Elliott Burglary. Those burglaries occurred on July 13, 2015. Her testimony established that she dropped off and picked up Aiken near the Cox and Elliott residences in Dagsboro on that day.[39] However, Marcie said that she was just going to Dagsboro to meet a friend for lunch and that Aiken asked her for a ride. She did not testify that she took Aiken there so he could burglarize homes. Marcie advised that, once there, Aiken got out to look at a motorcycle. Her testimony tied Aiken to the black bag; she said that Aiken had the black bag when he came back from what was the Cox Burglary.[40] Marcie also testified that she drove Aiken around to various places in Sussex County. Marcie did *not* testify that she and Aiken were involved in a burglary spree in Sussex County in the summer of 2015.

---

39 At trial, Marcie was unable to recall her conversation with McCabe well, so the State presented the content of her statement through McCabe pursuant to 11 *Del. C.* §3507.
40 Dwayne also tied the black bag to Aiken, and, given Dwayne's physical and mobility limitations, it is obvious he was not the burglar.

In many criminal trials, defendants have few if any witnesses to offer testimony helpful to their cases. In this case, however, Marcie proffered testimony that was helpful to Aiken. I conclude that Trial Counsel's strategy of using Marcie's testimony to explain why Aiken was in the possession of jewelry and to blame the police for a shoddy investigation was not ineffective. Trial Counsel did the best they could under the circumstances. Moreover, merely attacking Marcie's credibility would have been problematic, in that other evidence corroborates much of her testimony.

Even if Trial Counsels' failure to establish Marcie's potential bias is deemed to be ineffective assistance of counsel, and even if Trial Counsel had attempted to establish such bias, I do not believe it would have changed the outcome of the trial. Her testimony on the Cox Burglary and the Elliott Burglary is credible because other evidence and the testimony of other witnesses corroborate it. Marcie's testimony about taking Aiken to a brick house on Firetower Road in Dagsboro is supported by other evidence showing that this location is right across the street from the Elliott residence. Her testimony about taking Aiken to the pizza place was corroborated by Cox's testimony about seeing a woman in a maroon car parked next to the pizza place and seeing a man run to the car. Marcie testified that Aiken was carrying a black bag when he got back in the car and that it had pills in it. Cox testified that

29

her pain pills were stolen. The police found a black bag on the floor of the camper when they arrested Aiken. Finally, the police found six items of distinctive jewelry stolen from the Burglaries in the brown and black bags that are linked to Aiken. The problem for Trial Counsel in attacking Marcie's credibility is that Marcie's testimony on the Burglaries was supported by other evidence that they could not attack. Attacking Marcie's credibility was not going to make that other credible evidence go away.

Thus, I find that Trial Counsel's strategy and actions were reasonable under the circumstances and therefore do not constitute ineffective assistance of counsel.

### Argument Four

Fourth, Aiken argues that Trial Counsel's post-trial Motion for Judgment of Acquittal failed to challenge his conviction for Conspiracy in the Second Degree. The indictment for the charge of Conspiracy in the Second Degree alleged that Aiken and Marcie conspired to commit burglaries or thefts between June 16, 2015 and June 21, 2015. Aiken was acquitted of those underlying burglaries and thefts. The Cox Burglary and the Elliott Burglary occurred later, on July 13, 2015. Thus, Aiken's Motion argues that he could not be convicted of conspiracy to commit any of the

30

underlying burglaries or thefts in June 2015. I disagree. Conspiracy to commit crimes is a separate and distinct offense from the underlying crimes themselves.[41]

I instructed the jury on the three elements of the conspiracy charge in this case as follows:

"(1) that the defendant intended, that is, it was his conscious object or purpose to promote or to facilitate, the commission of a felony of felonies: in this case, burglary in the second degree or theft greater than $1500";

(2) that the defendant agreed with another person, Marcie Mauzak, that they or one of them would engage in conduct constituting burglary in the second degree or theft greater than $1,500"; and,

(3) that the defendant or another person with whom he conspired, allegedly Marcie Mauzak, committed an overt act or acts in pursuance of the conspiracy."

I further instructed the jury:

"If the State has alleged more than one overt act in pursuance of the conspiracy, the jury must be unanimous as to at least one overt act."

The elements of the crime of conspiracy are different from the elements of the underlying crimes. It is not an element of conspiracy that you have to be convicted of the offense that is the object of the conspiracy in order to be convicted of the conspiracy.

---

41 *Broomer v. State*, 126 A.3d 1110 (Del. 2015), citing *Younger v. State*, 979 A.2d 1112 (Del. 2009) and *Holland v. State*, 744 A.2d 980 (Del. 2000),

Aiken argues that the State, in its Response to his Motion, does not identify the evidence supporting his conviction for Conspiracy in the Second Degree. This is Aiken's Motion. The burden is on him to comb through the evidence, identify it, and argue that there is insufficient evidence to support his conviction. Aiken has not done that. I will not do his work for him.

### Cumulative Effect

The Delaware Supreme Court has recognized that the *Strickland* test goes to the essential fairness of the trial[42] and that multiple material errors may be "so prejudicial to the substantial rights as to jeopardize the fairness and integrity of the trial process."[43] The key inquiry is whether the jury's verdict would have been the same.[44] Aiken argues that Trial Counsel's four errors, when taken together, prejudiced him so as to jeopardize the fairness and integrity of his trial.

I disagree. I have concluded that Trial Counsel were not ineffective and, even if they were, their errors did not affect the outcome of the trial, either separately or cumulatively. Aiken was convicted of the Burglaries because he was found in possession of six pieces of distinctive jewelry related to those two burglaries, and Marcie's testimony regarding those Burglaries was corroborated by the testimony of

---

42 Starling v. State, 130 A.2d 316, 336 (Del. 2015).
43 *Id.*, at 336.
44 *Id.*, citing *Kyles v. Whitley*, 514 U.S. 419 (1995).

32

Cox and other evidence. Trial Counsel did a good job in this case. Aiken was charged with a number of burglaries and was only convicted of two of them: the Burglaries where the State had firmly convincing evidence of his guilt.

Therefore, for the reasons set forth above, I find that the Motion for Postconviction Relief must be **DENIED**.

**IT IS SO ORDERED**.

Very truly yours,

E. Scott Bradley

ESB/tll

cc:     Prothonotary

FILED PROTHONOTARY SUSSEX COUNTY 2020 FEB 19 P 12:02

33